**UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

_____

No. 97-50566
_____


KIM J. LINKOUS, Individually and as next friend of Joshua
Linkous, Kirsten Linkous, and Justin Linkous, minor children,

Plaintiff-Appellee,

VERSUS

UNITED STATES OF AMERICA,

Defendant-Appellant,

LYDIA SIMS, M.D.,

Defendant-Appellee.


_____

Appeal from the United States District Court
for the Western District of Texas
_____
June 9, 1998


Before KING, BARKSDALE, and PARKER, Circuit Judges.

ROBERT M. PARKER, Circuit Judge:

The Plaintiffs, Kim J. Linkous, individually and on behalf of her minor children, sued the Defendants, the United States and Lydia Sims, M.D., under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346(b), for injuries received during medical treatment at Darnell Army Community Hospital ("DACH"). The United States appeals from an order of the district court certifying that Dr. Sims was an employee of the United States operating in the course

and scope of her office or employment when treating Linkous.  After reviewing the briefs and record on appeal, we reverse the decision of the district court.

## I.

The Defendant, Dr. Lydia Sims, contracted with DACH to provide obstetrics/gynecological ("ob/gyn") services to beneficiaries of the Civilian Health and Medical Program of the Uniformed Services ("CHAMPUS"), a statutory health benefits program that provides medical and dental benefits for dependants of active-duty military service members and military retirees.  *See* 10 U.S.C. §§ 1076-79.  Federal law authorizes the Secretary of Defense to enter into partnership agreements which provide "for the sharing of resources between facilities of the uniformed services and facilities of a civilian health care provider."  10 U.S.C. § 1096.  Pursuant to this statutory authorization, the Department of Defense promulgated regulations permitting the type of agreement at issue here, whereby private practitioners provide health care services within military facilities.  *See* 32 C.F.R. § 199.1(p).

The terms of the partnership agreement between DACH and Dr. Sims were set forth in a Memorandum of Understanding ("MOU").  The MOU described Dr. Sims as a "participating health care provider" and indicated that Dr. Sims was to be compensated on a fee-for-service basis.  Because Dr. Sims used DACH facilities, she received seventy percent of the rate paid to private practitioners who

2

provide CHAMPUS health care services outside DACH. Dr. Sims did not determine the fees charged for her services. The MOU required Dr. Sims to provide full professional liability insurance covering acts or omissions committed by Dr. Sims or her support personnel, who are not covered by the Gonzalez Act, 10 U.S.C. § 1089. The Gonzalez Act renders FTCA remedies exclusive with respect to torts committed by military health care personnel. The MOU also required Dr. Sims to obtain insurance for the purpose of indemnifying the United States for any liability resulting from her exercise of clinical privileges at DACH. The MOU acknowledged the government's liability for the acts of its "employees" but indicated that DACH was not liable for the acts of "participating health care providers." Although Dr. Sims had access to support personnel and facilities at DACH, she hired her own nurse-chaperone to assist her with patients. In contrast, military physicians use only military personnel or Red Cross volunteers as nurse-chaperones. Dr. Sims, however, used DACH personnel to schedule her appointments, accepted all referrals from DACH practitioners, and only referred her patients to other DACH practitioners.

The MOU further provided that Dr. Sims was required to adhere to all hospital bylaws and Army regulations to the same extent as Army health care providers. For example, Dr. Sims was required to adhere to the policy of obtaining informed consent at least thirty days prior to performing a tubal ligation. Dr. Sims, however, was not subject to other supervisory controls imposed on military health care personnel. Dr. Silver, the former Chief of the

3

Department of Obstetrics and Gynecology at DACH, stated that he lacked authority to assign Dr. Sims a schedule, require Dr. Sims to attend morning meetings, or conduct routine performance evaluations of Dr. Sims. Additionally, the MOU required Dr. Sims to undergo a credentialing procedure, similar to the type utilized at private hospitals, in order to obtain privileges at DACH. While Dr. Sims had no admitting privileges at any other hospital and did not maintain an office or see patients outside her practice at DACH, the terms of the MOU did not prohibit Dr. Sims from practicing outside DACH. Finally, as a prerequisite to receiving CHAMPUS fee-for-service payments, Dr. Sims certified that she was not an employee of the United States on the CHAMPUS application.

As a military dependent, the Plaintiff, Kim Linkous, sought gynecological services from DACH and was referred to Dr. Sims. While performing a laparoscopic tubal ligation on Linkous, the plaintiff alleges that Dr. Sims acted negligently by lacerating Linkous's right common iliac artery, thereby causing significant and continuing injury. Linkous brought suit on behalf of herself and her minor children, seeking recovery for her injuries under the FTCA, against Dr. Sims and the United States. The United States moved for dismissal, contending that Dr. Sims was not an employee of the government. The Plaintiffs and Dr. Sims opposed the motion to dismiss, and Dr. Sims asked the district court to certify that she was an employee of the United States acting within the scope of her employment and to substitute the United States as defendant pursuant to 28 U.S.C. § 2679(d)(3). The district court denied the

government's motion to dismiss, certified Dr. Sims as an employee of the United States acting within the scope of employment, and substituted the United States for Dr. Sims as the sole defendant. On motion of the United States, the district court certified for interlocutory appeal, pursuant to 28 U.S.C. § 1292(b), that the previous order turns on "a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation."

## II.

"It is elementary that the United States, as sovereign, is immune from suits save as it consents to be sued . . . and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit." *United States v. Mitchell*, 445 U.S. 535, 538 (1980); *Broussard v. United States*, 989 F.2d 171, 174 (5th Cir. 1993). The FTCA constitutes a limited waiver of sovereign immunity. *See* 28 U.S.C. § 1346(b); *United States v. Orleans*, 425 U.S. 807, 813 (1976). Courts must strictly construe all waivers of the federal government's sovereign immunity, and must resolve all ambiguities in favor of the sovereign. *See United States v. Nordic Village, Inc.*, 503 U.S. 30, 33 (1992). Under the FTCA, Congress has waived sovereign immunity and has granted consent for the government to be sued for acts committed by any "employee of the Government while acting within the scope of his

5

office or employment."[1]  28 U.S.C. § 1346(b).  The FTCA, however, does not extend to acts of independent contractors.  *See Orleans,* 425 U.S. at 813-14; *Broussard,* 989 F.2d at 174.  Therefore, if the act was not committed by an "employee of the Government," then the court must dismiss for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1). *See Broussard*, 989 F.2d at 177.  We apply a de novo standard of review to the question of whether an individual is an "employee of the government" for purposes of the FTCA.  *See Rodriguez v. Sarabyn,* 129 F.3d 760, 765 (5th Cir. 1997); *Williams v. United States*, 71 F.3d 502, 504 (5th Cir. 1995).

The critical factor in determining whether an individual is an employee of the government or an independent contractor is the power of the federal government to control the detailed physical performance of the individual.  *See United States v. Orleans*, 425 U.S. 807, 814 (1976); *Broussard*, 989 F.2d at 174; *see also Logue v. United States*, 412 U.S. 521, 527 (1973)("[T]he distinction between the servant or agent relationship and that of independent contractor turn[s] on the absence of authority in the principal to control the physical conduct of the contractor in performance of the contract.").  Although "control of the detailed physical performance may be the most critical factor in identifying an employee, it is not necessarily the only factor."  *Broussard*, 989

---

[1] "Employee of the Government" is defined to include "officers or employees of any federal agency, members of the military or naval forces of the United States, . . . and persons acting on behalf of a federal agency in an official capacity, temporarily or permanently in the service of the United States, whether with or without compensation." 28 U.S.C. § 2671.

6

F.2d at 175.  As the court in *Broussard* recognized, if control were the only factor, then no professional who exercises professional judgment could be considered a federal employee under the FTCA. *Id.*  Therefore, in *Rodriguez v. Sarabyn*, 129 F.3d 760, 765 (5th Cir. 1997), in addition to control, this court cited the factors listed in § 220 of the Restatement (Second) of Agency to differentiate between an employee and independent contractor under the FTCA.  Section 220 lists the following factors as relevant in determining whether an individual is an employee or an independent contractor:

> (a) the extent of control which, by the agreement, the master may exercise over the details of the work;
> (b) whether or not the one employed is engaged in a distinct occupation or business;
> (c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision;
> (d) the skill required in the particular occupation;
> (e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work;
> (f) the length of time for which the person is employed;
> (g) the method of payment, whether by the time or by the job;
> (h) whether or not the work is a part of the regular business of the employer;
> (i) whether or not the parties believe they are creating the relation of master and servant; and
> (j) whether the principal is or is not in business.

RESTATEMENT (SECOND) OF AGENCY § 220 (1958).[2] *See also Rodriguez v. Sarabyn*, 129 F.3d at 765 (citing RESTATEMENT (SECOND) OF AGENCY § 220). If the government lacks the power to directly control an individual, then the court must look at other factors before deciding the individual's status as employee or independent contractor. *See Rodriguez*, 129 F.3d at 765. Although such a determination does not require mathematical precision, if the government lacks the power to control an individual, plus several factors listed in § 220 weigh in favor of independent contractor status, then a court must conclude that the individual is an independent contractor. Consequently, we look to the factors listed in § 220 of the Restatement of Agency in order to determine whether Dr. Sims was an employee of the government or an independent contractor at the time of Linkous's tubal ligation.

Factor (a), the extent of control which the employer exercises over the details of the work, weighs in favor of independent contractor status because DACH exercised no control over the

---

[2] In *Rodriguez v. Sarabyn*, the court referenced the explanatory comments to the Restatement of Agency, which lists the following factors, in addition to control, as evidence of the existence of an employee relationship:

> (1) the work does not require one who is highly educated or skilled; (2) the work is typically done by an employee in the locale, rather than an independent contractor; (3) the employer supplies the tools, instrumentalities, or place of work; (4) the employment is for a considerable period of time with regular hours; (5) the method of payment is by the hour or month; (6) the work is full-time employment by one employer; (7) the work is part of the employer's regular business; and (8) the parties believe they have created an employment relationship.

*See Rodriguez v. Sarabyn*, 129 F.3d 760, 765 (5th 1997)(citing RESTATEMENT (SECOND) OF AGENCY § 220(2) & cmt. h)).

medical services that Dr. Sims provided to her patients. Although DACH exercised some control over the administrative aspects of Dr. Sims's practice, such as scheduling appointments and determining fees, DACH exercised no control over the day-to-day rendition of medical services. The appellees argue that requiring Dr. Sims to abide by the informed consent policy established control over Dr. Sims's physical performance. While the informed consent policy may affect the doctor-patient relationship by subjecting Dr. Sims to some minimum requirements regarding notification and consent, this policy did not intrude on the daily rendition of medical services or override Dr. Sims's medical judgment regarding diagnosis and treatment. Although the lack of control is of critical importance, we must consider the remaining factors to determine the relationship between Dr. Sims and DACH.

The next two factors also support Dr. Sims's status as an independent contractor. As an ob/gyn at DACH, Dr. Sims was "engaged in a distinct occupation" (factor (b)) of the type usually done "by a specialist without supervision" (factor (c)). Additionally, factor (d) weighs in favor of independent contractor status because Dr. Sims's occupation required a high degree of skill. Factor (g) also indicates independent contractor status because Dr. Sims was paid on a fee-for-service basis, like all non-government doctors participating in the CHAMPUS program, rather than an annual salary like military doctors. Finally, factor (i) supports independent contractor status because the record shows that the parties did not believe that they were creating an

9

employer-employee relationship. As noted earlier, Dr. Sims indicated on her application for CHAMPUS reimbursement that she was not an employee of the federal government. Furthermore, under the terms of the MOU, Dr. Sims agreed to obtain professional liability insurance covering the acts or omissions of Dr. Sims, as well as any support personnel that she hired. If Dr. Sims believed she was becoming an employee of DACH, then there would have been no need for her to indemnify the government for her negligence.

Conversely, factors (e), (f), (h), and (j) support the conclusion that Dr. Sims was an employee of DACH. DACH provided the "instrumentalities, tools, and the place of work" for Dr. Sims (factor (e)). Dr. Sims worked at DACH for a period of several years (factor (f)). DACH is in the business of providing a wide range of medical services, including the ob/gyn services provided by Dr. Sims (factors (h) and (j)). After considering the factors listed in § 220, we conclude that Dr. Sims was an independent contractor rather than an employee of the government. We reach this conclusion because the government exercised no control over the detailed physical performance of Dr. Sims, plus the balance of remaining factors weighs in favor of independent contractor status.

The Appellees contend that Dr. Sims could not have been an independent contractor because she contracted directly with the government, rather than with an intermediate medical facility or physician group which in turn contracted with the government. Both the Plaintiffs and Dr. Sims cite to *Broussard*, where the defendant-physician was employed by an independent contractor to the federal

10

government, which in turn hired and paid the doctor as an employee. *See Broussard*, 989 F.2d at 173. Unlike the defendant in *Broussard*, Dr. Sims contracted directly with the government (ie. she was selected by the Chief officer at DACH, and she was paid directly by the government through CHAMPUS reimbursement). We fail to see the relevance of this distinction. According to the Appellees' argument, individuals cannot be independent contractors. In *Rodriguez*, the appellant made a similar argument to no avail. *See Rodriguez*, 129 F.3d at 766. Individuals can contract directly with the government and remain independent contractors, as long as the agreement between the parties does not grant the government control over the detailed physical performance of the individual, and the remaining factors weigh in favor of independent contractor status. Consequently, the district court erred by certifying that Dr. Sims was acting within the scope of her employment when treating Linkous.

## III.

Alternatively, the Appellees contend that the government should be equitably estopped from denying Dr. Sims' status as a government employee. Equitable estoppel is rarely valid against the government. *See United States v. Bloom*, 112 F.3d 200, 205 (5th Cir. 1997). Courts have applied estoppel to the federal government only in the narrowest of circumstances. *Id.* In order to establish estoppel against the government, a party must prove affirmative misconduct by the government in addition to the four traditional

11

elements of the doctrine. *See id. See also Broussard,* 989 F.2d at 177 ("At a minimum, the government would have to engage in affirmative misconduct before it could be estopped, and even then affirmative misconduct may not be sufficient to prevent dismissal for lack of subject matter jurisdiction."). The four traditional elements of estoppel are: (1) that the party to be estopped was aware of the facts, and (2) intended his act or omission to be acted upon; [and] (3) that the party asserting estoppel did not have knowledge of the facts, and (4) reasonably relied on the conduct of the other to his substantial injury. *See Bloom*, 112 F.3d at 205.

The Appellees argue that the traditional elements of estoppel have been met. First, the party to be estopped, the United States, was aware of the facts surrounding the employment relationship with Dr. Sims. Second, DACH held Dr. Sims out as an employee by purporting to be a full service hospital, requiring Dr. Sims to wear the same uniform and identification as military physicians, and using the same receptionist to schedule appointments for military physicians. Third, the Plaintiff was unaware that Dr. Sims was not an employee of DACH. And fourth, the Plaintiff relied, to her detriment, on the government's actions in holding Dr. Sims out as an employee. The United States responds that the government cannot be equitably estopped. The United States argues that in the unlikely event estoppel is available against the government, the Plaintiff must at least show that the government engaged in affirmative misconduct. Furthermore, the government

contends the Plaintiffs have failed to allege any facts supporting the necessary element of detrimental reliance because Linkous has not indicated that she would have acted differently had she known that Dr. Sims was not an employee of the government.

The Appellees have failed to demonstrate any affirmative misconduct on the part of the government.[3] "Affirmative misconduct" requires an affirmative misrepresentation or affirmative concealment of a material fact by the government. *See Carrillo v. United States*, 5 F.3d 1302, 1306 (9th Cir. 1993). The Plaintiffs contend that DACH has committed affirmative misconduct by holding Dr. Sims out as an employee of the government and by requiring CHAMPUS beneficiaries to seek medical services from military hospitals in an effort to save money. We do not agree. Merely requiring Dr. Sims to wear the same uniform and identification as military doctors and using the same receptionist to schedule appointments for Dr. Sims and military doctors does not amount to "affirmative misconduct." DACH did not affirmatively conceal Dr. Sims's status as an independent contractor or affirmatively misrepresent to Linkous that Dr. Sims was an employee of DACH. Although DACH may have created the circumstances that

---

[3] In support of their claim of equitable estoppel, the Appellees rely on *Utterback v. United States*, 668 F.Supp. 602, 607 (W.D. Ky. 1987) and *Gamble v. United States*, 648 F.Supp. 438, 441– 42 (N.D. Ohio 1986). In these two cases, the district courts held that the government was estopped from denying the employee status of negligent physicians because the government hospitals had held themselves out as full-service hospitals. As the Ninth Circuit has noted, "*Gamble* and *Utterback* confuse affirmative action with affirmative misconduct." *Carrillo v. United States*, 5 F.3d 1302, 1306 (9th Cir. 1993).

13

allowed Linkous to incorrectly assume that Dr. Sims was an employee of the hospital, we cannot say that this rises to the level of "affirmative misconduct." Furthermore, requiring CHAMPUS beneficiaries to seek medical services at military facilities in an effort to save money does not constitute affirmative misconduct. The Appellees cite no authority for the proposition that such cost-saving efforts of themselves constitute affirmative misconduct, and we see no reason to conclude that such measures amount to affirmative misconduct. Additionally, the Plaintiffs have failed to demonstrate that Linkous detrimentally relied upon the belief that Dr. Sims was a government physician. Although the Plaintiffs baldly assert that Linkous "relied on the government's actions in holding Dr. Sims out as its employee to her detriment," the Plaintiffs fail to indicate what Linkous would have done differently had she known that Dr. Sims was a government contractor.

The Appellees have failed to show affirmative misconduct by the government or detrimental reliance by Linkous. Consequently, the Appellees have failed to establish the necessary elements of equitable estoppel.

IV.

For the foregoing reasons, the order of the district court certifying that Dr. Sims was acting in the course and scope of her employment is REVERSED. Accordingly, the case is DISMISSED for lack of subject matter jurisdiction.

14