Kevin DELVALLE, et al., Plaintiffs,

v.

Dr. Rafael SANCHEZ,
et al., Defendants.

Dr. Rafael Sanchez, et al.,
Cross–Claimants,

v.

United States of America and Coconut Grove Family Health Center, Inc.,
Cross–Defendants.

No. 99–0049–CIV.

United States District Court,
S.D. Florida.

Sept. 25, 2001.

Mark Press, Esq., Miami Beach, FL, for Plaintiffs.

Moises Thomas Grayson, Esq., Blaxberg Grayson & Singer, Miami, FL, Benito Diaz, Esq., Diaz & Morel–Saruski, Coral Gables, Maureen Donlan, Esq., Miami, FL, Scott Kirschbaum, Esq., Coral Gables, Joel Wolpe, Esq., Miami, FL, Ramon Abadin, Esq., Abadin & Jaramillo, Miami, FL, Alan Gordon Cohen, Esq., Cohen & Kandell, Miami, FL, Frederick E. Hasty, III, Esq., Wicker Smith O'Hara Mcoy, et al., Miami, FL, John Stephen Derr, Tallahassee, FL, for Defendants.

### *ORDER ON MOTIONS FOR SUMMARY JUDGMENT*

GOLD, District Judge.

**THIS CAUSE** is before the court upon the defendants' motions for summary judgment (DE # 193, 218, 237, 269, 364). The plaintiffs, Kevin Del Valle ("Del Valle") and Idania Fernandez ("Fernandez"), have filed a fourth amended complaint against the defendants, Dr. Rafael Sanchez ("Dr.Sanchez"); Dr. Lourdes Ramon ("Dr.Ramon"); United States of America; Dr. Jose Portuondo ("Dr.Portuondo"); Damus, Ecker, Rosenthal & Marshall, M.D., P.A., d/b/a Emergency Room Medical Associates ("ERMA"); Mercy Hospital, Inc.; Dr. Luis Fernandez–Rocha ("Dr.Fernandez–Rocha"), and Sanchez, Fernandez–Rocha, & Pou, P.A.[1] The plaintiffs allege medical negligence in the care of Fernan-

---

1. The defendants originally sought summary judgment on the plaintiffs' third amended

dez during her pregnancy. Dr. Sanchez, Dr. Fernandez–Rocha, Dr. Ramon, and Sanchez, Fernandez–Rocha, & Pou, P.A. have filed a crossclaim against the United States and the Coconut Grove Family Health Center, Inc. for indemnification.[2] Subject matter jurisdiction exists pursuant to 28 U.S.C. § 1331 and 1367.

The plaintiffs' third amended complaint was removed from state court on January 8, 1999, by the Family Health Center and the United States. In the notice of removal, the defendants alleged that the Family Health Center was an entity receiving federal grant money and an employee of the United States for purposes of the Federal Tort Claims Act. Both 42 U.S.C. § 233(c) and 28 U.S.C. § 2679(d)(2) provide that, upon certification by the Attorney General, any civil action or proceeding commenced in a state court shall be removed by the Attorney General to the district court and shall be deemed to be an action or proceeding against the United States under the provisions of Title 28. On June 24, 1999, the United States was substituted as the proper party defendant in place of the Family Health Center.

The United States now requests summary judgment on the crossclaim and the fourth amended complaint to the extent that the parties seek to hold the United States liable for the actions of Dr. Sanchez, Dr. Fernandez–Rocha, Dr. Ramon, and Sanchez, Fernandez–Rocha, & Pou, P.A. Dr. Sanchez seeks summary judgment on the same issue. Mercy Hospital, Dr. Ramon, and Dr. Portuondo and ERMA have filed motions for summary judgment in which they argue that the record is devoid of any evidence that would support a finding of negligence against them. On July 27, 2001, the court heard oral arguments on the defendants' motions. After carefully considering the pleadings, evidence, and arguments of counsel, the court grants the United States's motion, grants in part and denies in part Mercy Hospital's motion, and denies the remaining defendants' motions.

### Statement of Facts [3]

### I. The Parties

The Helen B. Bentley Family Health Center ("Family Health Center"), which

---

complaint, but the plaintiffs filed a fourth amended complaint on April 16, 2001, after most of the summary judgment issues had been briefed. Because the fourth amended complaint does not significantly alter the plaintiffs' claims, but merely adds a count against Mercy Hospital, the summary judgment motions may be applied to this complaint. The plaintiffs allege the following claims in their fourth amended complaint: count I, negligence against Dr. Sanchez; count II, negligence against Dr. Ramon; count III, negligence against the United States; count IV, vicarious liability against the United States; count V, negligence against Dr. Portuondo; count VII, vicarious liability against ERMA; count VIII, negligence against Mercy Hospital; count IX, vicarious liability against Mercy Hospital; count X, negligence against Dr. Fernandez–Rocha; count XI, vicarious liability against Sanchez, Fernandez–Rocha, & Pou, P.A.; count XII, financial responsibility under Fla.

Stat. § 548.320(2)(b) against Mercy Hospital; count XIII, Del Valle's claim for damages; and count XIV, Fernandez's claim for damages.

2. The cross-claimants allege the following: count I, declaratory relief finding that they were employees of the United States; count II, breach of contract against the Coconut Grove Family Health Center ("Family Health Center"); and count III, contractual indemnity against the Family Health Center. Count I is the only count in the crossclaim that contains allegations against the United States. The United States has not been substituted, and it does not seek to be substituted, in place of the Family Health Center as to the remaining counts of the crossclaim.

3. Pursuant to Southern District of Florida Local Rule 7.5, the defendants have filed concise statements of facts to which they claim there

was formerly known as the Coconut Grove Family Health Center, Inc., provides medical services to low income individuals in Miami–Dade County, Florida. The plaintiff, Idania Fernandez, first presented to the Family Health Center on or about January 10, 1996 for a pregnancy test, which was positive. Fernandez received prenatal care at the Family Health Center from January 1996 to April 1996. Throughout her pregnancy, Fernandez experienced complications, which she claims were misdiagnosed by doctors at Mercy Hospital and the Family Health Center. Due to these complications, on April 27, 1996, Idania Fernandez gave birth prematurely to a son, plaintiff Kevin Del Valle, at Jackson Memorial Hospital. Since his birth, Del Valle has suffered from severe respiratory and developmental problems, including cerebral palsy and microcephaly.

At all relevant times, Dr. Sanchez, Dr. Ramon, and Dr. Fernandez–Rocha were employees of the professional association, Sanchez, Fernandez–Rocha & Pou, M.D., P.A.[4] During that time, Dr. Sanchez, Dr. Ramon, and Dr. Fernandez–Rocha were engaged in the private practice of obstetrics and gynecology in Miami–Dade County, Florida. Dr. Portuondo was an employee of ERMA, which provided emergency room care at Mercy Hospital.

## II. Fernandez's Treatment During Her Pregnancy

### A. Fernandez's Emergency Room Visit

Fernandez began to experience complications early in her pregnancy. On April 15, 1996, she was seen in Mercy Hospital's emergency room. Fernandez stated that she chose Mercy Hospital because she believed that Dr. Ramon and Dr. Fernandez–Rocha "belonged" to, or were employed by, the hospital; a sign at the Family Health Center instructed all patients to go there; and the Family Health Center would transport its patients to Mercy Hospital for a tour of the labor and delivery facilities. *See* Fernandez Depo. at 50–53. Additionally, Fernandez claims that a plaque at Mercy Hospital listed Dr. Sanchez, Dr. Ramon, and Dr. Fernandez–Rocha as staff employees. *See* Fernandez Depo. at 83–86 .[5]

Mercy Hospital's emergency room physician, Dr. Jose Portuondo,[6] ordered a urinalysis, complete blood count, and a pelvic ultrasound. The ultrasound was interpreted by Dr. Rafael Ramirez. Dr. Ramirez diagnosed Fernandez as having an incom-

---

is no dispute. The plaintiffs contest some of the allegations contained in the defendants' statements. The following facts are derived from the defendants' Local Rule 7.5 statements, and any factual disputes between the parties are noted.

**4.** The case against Dr. Fernandez–Rocha and Fernandez–Rocha, Sanchez, & Pou, P.A., is temporarily closed pursuant to a suggestion of bankruptcy. The case remains open as to all other codefendants because the protection of the automatic stay does not apply to codefendants who are not in bankruptcy. *See Ingersoll–Rand Fin. Corp. v. Miller Min. Co.,* 817 F.2d 1424, 1427 (9th Cir.1987).

**5.** During the relevant time, the Family Health Center, as a member of the Health Choice Network, actively encouraged its patients to deliver their babies at Mercy Hospital, rather than Jackson Memorial Hospital, because Family Health Center doctors could not administer to patients in Jackson. *See* Bridges Depo. at 20–24. Ed Rosasco, Mercy Hospital's CEO, attended a meeting to "tie up" Mercy Hospital in this project, and he stated that the hospital wanted the Family Health Center's patients to deliver there. *See* Fernandez–Rocha Depo. at 88–89.

**6.** Dr. Portuondo was an employee of Emergency Room Medical Associates ("ERMA").

petent cervix.[7] Shortly after making this diagnosis, Dr. Ramirez telephoned his findings to Dr. Portuondo, but Dr. Portuondo never independently diagnosed Fernandez as having an incompetent cervix nor did he relay Dr. Ramirez's findings to another doctor. *See* Ramirez Depo. at 18–19, 57–58.

Later that evening, Fernandez was transferred to the labor and delivery department, and she came under the care of Dr. Sanchez, the on-call obstetrician for the Family Health Center. Despite the fact that there were numerous indications making it mandatory that a doctor examine the patient and perform several tests, Dr. Sanchez never did so. *See* Creevy Depo. at 140–41. Fernandez was discharged from Mercy Hospital on April 16, 2001 with discharge instructions *"to be seen* and for Ampicillin prescription." Edwards Depo. at 106 (emphasis added). No one who saw Fernandez at Mercy Hospital ever informed her of Dr. Ramirez's diagnosis of an incompetent cervix.

### B. Dr. Ramon's Treatment of Fernandez

Dr. Ramon's care of Fernandez during her pregnancy involves two visits by Fernandez to the Family Health Center. The first occurred on February 25, 1996, when she was examined by Dr. Ramon. The complaint contains no allegations of negligence regarding this visit.

The second interaction occurred on April 17, 1996, when Dr. Ramon wrote Fernandez a prescription for ampicillin while Fernandez was at the clinic. *See* Creevy Depo. at 155. Fernandez went to the Family Health Center on that date because, upon her discharge from the hospital on April 16, her written instructions by

the hospital were to be seen at the Family Health Center and to pick up a prescription for ampicillin. Dr. Ramon was the doctor seeing gynecological and obstetrical patients on April 17. She wrote Fernandez's prescription, but she did not examine her or take a medical history.

Although Fernandez had visited the hospital on the prior day, and doctors had administered an ultrasound and had discovered leakage of amniotic fluid, Dr. Ramon had no knowledge of this hospital visit when she wrote the prescription because the hospital never transmitted this information to the Family Health Center. *See* Creevy Depo. at 156. According to Dr. Ramon, if one of the physicians at the Family Health Center was caring for a patient with an incompetent cervix, this information would be relayed to all members of the group because such a condition places the patient in a high-risk situation. *See* Ramon Depo. at 29–33. Dr. Sanchez and Dr. Fernandez–Rocha also testified that the Family Health Center had a procedure whereby the doctors would communicate with each other concerning the condition of certain patients they were treating together. Sanchez Depo. at 13–15; Fernandez–Rocha Depo. at 87–88. Despite the existence of this procedure, the doctors of the Family Health Center did not communicate to each other regarding Fernandez's condition.

Dr. Donald Creevy, the plaintiff's expert, has stated:

Dr. Ramon should have had information about the hospital visit of April 15th, April 16th, with the ultrasound, with the complaint of leakage of amniotic fluid. And if, in fact, she had that information available to her, she should have done an

---

**7.** An incompetent cervix is incapable of holding a full term intrauterine pregnancy. This condition can lead to a premature birth.

actual visit and examine the patient, not just handing the nurse a prescription. Creevy Depo. at 156. Dr. Creevy added that Dr. Ramon's lack of knowledge about Fernandez's hospital visit was not her "failing specifically. It's a failing of the clinic and the staff doctors there as a group." *Id.* Dr. Ramon has averred that she had no obligation to undertake transmission of Fernandez's records between Mercy Hospital and the Family Health Center.

### III. Facts Relevant Under the Federal Tort Claims Act

On or about December 4, 1995, the professional association, Sanchez, Fernandez–Rocha & Pou, M.D., P.A. entered into an agreement with the Family Health Center to provide obstetrical and gynecological services at the clinic for the period of December 4, 1995 to December 4, 1996. *See* United States, Ex. 1.[8] During the time Fernandez received prenatal care, the defendants were governed by this contract. It provides that the professional association "shall be acting as an independent contractor in relation to the Health Center ... and shall not be considered as having employee status for the purpose of any employee benefit plan applicable to the Health Center's employees generally." United States, Ex. 1 at ¶ 5. The professional association agreed to provide sixteen hours of medical services per week from January 1, 1996 to the end of the contract, which was signed by Dr. Sanchez, Dr. Fernandez–Rocha, and Dr. Pou on behalf of the professional association. *See* United States, Ex. 1 at ¶ 4.

Dr. Rafael Sanchez, Dr. Lourdes Ramon, and Dr. Luis Fernandez–Rocha provided medical services to patients at the Family Health Center pursuant to the contract entered into between the Family Health Center and the professional association, Sanchez, Fernandez–Rocha & Pou, M.D., P.A. During the relevant time period, Dr. Sanchez, Dr. Ramon, and Dr. Fernandez–Rocha did not have individual agreements with the Family Health Center to provide medical services at the clinic. The Family Health Center paid the professional association of Sanchez, Fernandez–Rocha, & Pou, P.A., for all services rendered to the patients of the Family Health Center by the individual physicians. All checks issued by the Family Health Center for the services of these doctors were made payable to the professional association. *See* United States, Ex. 3–A. The Family Health Center did not take any deductions from these checks for Social Security taxes, Medicare taxes, or federal income taxes. *See* United States, Ex. 2, Davis Affid. at 2–3; Ex 3, Stefanos Affid. at 2. From December 4, 1995 to December 1, 1996, the Family Health Center did not provide any employee benefits to Dr. Sanchez, Dr. Fernandez–Rocha, Dr. Pou, and Dr. Ramon. These doctors did not receive any vacation, sick leave benefits, health insurance, life insurance, or private medical malpractice insurance from the Family Health Center, nor were they allowed to participate in the Family Health Center's retirement program. *See* United States, Ex. 2 at 3.

While Fernandez was receiving her prenatal care at the Family Health Center, Dr. Vincent Jarvis was the Center's Medical Director. Dr. Jarvis, who is an internist, did not supervise the medical care provided to obstetrical/gynecological patients at the Family Health Center by Dr. Sanchez, Dr. Fernandez–Rocha, and Dr. Ramon. Dr. Jarvis did not give these doctors any specific duties at the Family

---

8. When this agreement expired in December of 1996, the individual doctors entered into new agreements with the Family Health Center. *See* Pl. Opp. to U.S. Mtn., Ex. 2.

Health Center, and he did not prepare written evaluations of the work done by the doctors. *See* United States, Ex. 4, Jarvis Depo. at 12–15; Ex. 2 at 4.

During the relevant period, Dr. James Bridges was the Chief of Obstetrics and Gynecology for the Health Choice Network, which is comprised of three health centers, including the Family Health Center. Dr. Bridges was an employee of the Economic Opportunity Family Health Center from December 1, 1995 until November 30, 1997, but he was not employed by the Coconut Grove Family Health Center. *See* United States Ex. 5, Bridges Depo. at 5–8. During the time at issue, Dr. Bridges devoted fifty percent of his time to his practice at the Economic Opportunity Family Health Center, and he divided the remainder of his time between the Family Health Center and Community Health of South Dade, Inc. Although Dr. Bridges rarely saw the members of the Sanchez, Fernandez–Rocha, & Pou, P.A., group at the Family Health Center, he would meet with them at their private offices and at restaurants to discuss any problems they were having at the Family Health Center. Dr. Bridges evaluated these doctors each year based upon his relationship with them and patient outcomes. *See* United States, Ex. 5 at 10–13, 18–20, 33–33, 36–37. He never assigned any patients to the professional association or the individual doctors, nor did he ever give them specific duties. While working at the Family Health Center, Dr. Bridges did not supervise these doctors on a day-to-day basis because he considered them to be well-trained and highly qualified. *See* Ex. 5 at 32, 36, 48–50, 73.

### Summary Judgment Standard

Rule 56(c) of the Federal Rules of Civil Procedure authorizes summary judgment where the pleadings and supporting materials show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202(1986). The court's focus in reviewing a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. Sept. 1997). The moving party has the burden to establish the absence of a genuine issue as to any material fact. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142(1970); *Tyson Foods, Inc.*, 121 F.3d at 646. Once the moving party has established the absence of a genuine issue of material fact, to which the nonmoving party bears the burden at trial, it is up to the nonmoving party to go beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial." *Celotex v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Issues of fact are genuine only if a reasonable jury, considering the evidence presented could find for the nonmoving party. *See Anderson*, 477 U.S. at 247–51, 106 S.Ct. at 2510–11. In determining whether to grant summary judgment, the district court must remember that, "credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* 477 U.S. at 255, 106 S.Ct. at 2513.

### Analysis

I. **United States' Motion for Summary Judgment**

The United States has moved for partial summary judgment in its favor as to count I of the crossclaim and counts III, IV, and

XII of the third amended complaint to the extent that these counts seek to hold the United States liable for the actions of Dr. Sanchez, Dr. Ramon, Dr. Fernandez–Rocha, and the professional association of Sanchez, Fernandez–Rocha, & Pou, P.A.[9] According to the United States, it is entitled to summary judgment because, during the relevant time, Dr. Sanchez, Dr. Ramon, Dr. Fernandez–Rocha, and Sanchez, Fernandez–Rocha, & Pou, P.A. were not employees of the Family Health Center or covered contractors of the Public Health Service pursuant to the Federally Supported Health Center's Assistance Act ("FSHCAA"), 42 U.S.C. § 233, et seq. The United States argues that, because the doctors and the professional association do not fall under the FSHCAA, they are not entitled to coverage under the Federal Tort Claims Act ("FTCA"), and the United States is not responsible for the doctors' or professional association's negligence.[10] In response, the plaintiffs argue that the doctors were employees of the Family Health Center for FTCA purposes when Fernandez was receiving prenatal care.[11] The plaintiffs contend that, even if

they were not, the doctors must be deemed to be contractors of an eligible entity under the FSHCAA. The plaintiffs also argue that the doctrines of apparent agency and estoppel afford them relief. Having considered the arguments of the parties, the applicable case law, and the evidence in the record, the court makes the following determinations, as set forth below.

**A. The FTCA and FSHCAA**

▮ The exclusive remedy for claims against the United States for the tortious or negligent conduct of its employees is under the FTCA. Suits under the FTCA are limited to those that involve claims arising from "the negligent or wrongful act or omission of any employee of the Government ... acting within the scope of his office or employment." 28 U.S.C. § 1346(b). The FSHCAA, 42 U.S.C. § 233(g), provides an exclusive remedy under the FTCA, 28 U.S.C. § 1346(b), for medical malpractice of employees or contractors of the Public Health Service.[12]

9. The relevant counts asserted against the United States in the fourth amended complaint are counts III and IV. The United States seeks summary judgment on these claims only as they relate to the actions of Dr. Sanchez, Dr. Ramon, Dr. Fernandez–Rocha, and Sanchez, Fernandez–Rocha, and Pou, P.A. It does not request summary judgment to the extent that it has been substituted as a party for the Family Health Center. Because the United States is named as a defendant in substitution of the Family Health Center, federal question subject matter jurisdiction exists pursuant to 28 U.S.C. § 1331. The court has subject matter jurisdiction over the remaining state claims pursuant to 28 U.S.C. § 1367.

10. The United States concedes that the Family Health Center is a federal employee under the FTCA.

11. Dr. Sanchez has filed a motion for summary judgment on the same issue as the Unit-

ed States. He argues the opposite position and seeks a finding that he is entitled to coverage under the FTCA. The arguments contained in his motion are the same ones made by the plaintiffs in opposition to the United States's motion, and these are addressed in this subsection.

12. The relevant provision in the FTCA states, "[T]he district courts shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages ..., for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of an employee of the Government while acting within the scope of his office or employment...." 28 U.S.C. § 1346(b)(1). The FSHCAA goes on to state:

[A]n entity described in paragraph (4), and any officer, governing board member, or employee of such an entity, and any contractor of such an entity who is a physician or other licensed or certified health care

The FTCA specifically excludes "any contractor with the United States" from its coverage, but the FSHCAA expands the definition of employee under the FTCA to include contractors, subject to certain qualifications. *See Tisdale v. United States*, 62 F.3d 1367, 1371 (11th Cir.1995) (citing 28 U.S.C. § 2671). Thus, prior to the enactment of the FSHCAA, the United States was not liable under the FTCA for the acts or omissions of contractors. *See id.* (citing *United States v. Orleans*, 425 U.S. 807, 813–16, 96 S.Ct. 1971, 48 L.Ed.2d 390 (1976)). The issue presented, therefore, is whether Dr. Sanchez, Dr. Ramon, Dr. Fernandez–Rocha, and Sanchez, Fernandez–Rocha, & Pou, P.A. qualify under the statutory language of the FTCA and FSHCAA as employees or contractors of the Public Health Service. If they do, then they are entitled to qualified immunity, and the plaintiffs may proceed in their claims against the United States only.[13] If they do not, then the claims against the United States, as they relate to the doctors' actions, must be dismissed, and the doctors and professional association must be substituted for the United States as defendants.

## B. Whether the Doctors and Professional Association Are Employees

■ The FTCA was not intended to apply to all persons or groups that are in any way associated or receive funding from the federal government. As stated above, the FTCA applies to *employees* of the federal government. 28 U.S.C. § 1346(b)(1) (emphasis added). An " '[e]mployee of the government' includes officers or employees of any federal agency, members of the military or naval forces of the United States, . . . and persons acting on behalf of a federal agency in an official capacity, temporarily or permanently in the service of the United States." 28 U.S.C. § 2671.

■ The standard for determining whether a party is an employee of the federal government or an independent contractor was established in *United States v. Orleans*, 425 U.S. 807, 96 S.Ct. 1971 (1976) .[14] *See also Tisdale v. United States*, 62 F.3d 1367, 1371 (11th Cir.1995) (quoting *Orleans* and discussing test within Eleventh Circuit to determine whether party is independent contractor or employee). In that case, the court held that the determining factor was the level of control exercised by the federal government over the individual or agency. *Id.*, 425 U.S. at 814, 96 S.Ct. at 1975. The government's ability to compel compliance with standards, rules, and regulations was not important. Rather, in order to be considered a federal employee, the government had to have some level of control or supervision over the person's physical conduct and his or

practitioner . . . shall be deemed to be an employee of the Public Health Service. . . . The remedy against the United States for an entity described in paragraph (4) and any officer, governing board member, employee, or contractor . . . of such an entity who is deemed to be an employee of the Public Health Service pursuant to this paragraph shall be exclusive of any other civil action or proceeding. . . .
42 U.S.C. § 233(g)(1)(A).

**13.** Because the remedy provided by the FTCA is "exclusive of any other civil action . . . by reason of the same subject matter against the

employee whose act or omission gave rise to the claim," and the FTCA effectively substitutes the United States for the employee in the action, the employee becomes immune from any other civil action by the plaintiff arising from the incident. *Flohr v. Mackovjak*, 84 F.3d 386, 390 (11th Cir.1996) (explaining effect of FTCA) (citations omitted).

**14.** The question of whether one is an employee of the United States is to be determined by federal law. *See Logue v. United States*, 412 U.S. 521, 528, 93 S.Ct. 2215, 2219, 37 L.Ed.2d 121 (1973).

her day-to-day functions. *See id.; see also Tisdale*, 62 F.3d at 1371.

■ The contract that governed the relationship between the Family Health Center and Sanchez, Fernandez–Rocha, & Pou, P.A., in 1995 ("1995 agreement") provides persuasive support for the United States' argument that Dr. Ramos, Dr. Fernandez–Rocha, and Dr. Sanchez were not employees of the United States during the relevant period. *See Cruz v. United States*, 70 F.Supp.2d 1290, 1293 (S.D.Fla. 1998) (quoting *Wood v. Standard Products Co., Inc.*, 671 F.2d 825 (4th Cir.1982), which stated "the contract and the terms in fixing the relationship of the offending party are critical"). The 1995 Agreement states that the Family Health Center "wishes to purchase obstetrical and gynecological services" from the professional association. United States, Ex. 1 at 1. It clearly provides that the professional association is an independent contractor, not an employee:

> Independent Contractor Status. In furnishing their services hereunder, the [professional association] shall be acting as an independent contractor in relation to the [Family Health Center]. Accordingly, the [professional association] shall not ... be considered as having employee status for the purpose of any employee benefit plan applicable to the [Family Health Center]'s employees generally.

United States, Ex. 1 at ¶ 5. The 1995 agreement prevented the members of the professional association from attempting to lure clients to their private offices, and it required only sixteen hours per week of work by members of the association. It makes no reference to the individual doctors other than to state that the Family Health Center has examined their credentials and deems them to be worthy of admission. United States, Ex. 1 at 1. Nowhere does the agreement state that the

professional association or the doctors will be subject to the Family Health Center's control or supervision.

■ In fact, from the evidence contained in the record, the opposite appears to be true. Aside from the contract itself, courts have examined other factors to determine the degree of control exercised by the government. These factors include: (1) the payment of salary and insurance premiums; (2) the payment of taxes; (3) the intent of the parties; and (4) whether the government controlled the manner and method in which the doctor conducted his or her activities. *See Duplan v. Harper*, 188 F.3d 1195, 1200 (10th Cir.1999) (listing factors); *Cruz*, 70 F.Supp.2d at 1294 (same); *see also Robb v. United States*, 80 F.3d 884, 889 (4th Cir.1996) (listing additional factors such as percentage of physician's practice dedicated to clinic, physician's responsibility to provide office space, and lack of control by government over prescription drugs administered). Here, the individual doctors did not receive any of the benefits provided to employees of the Family Health Center. They did not receive sick leave, vacation pay, health insurance, life insurance, or private medical malpractice insurance from the Family Health Center. *See* United States, Ex. 2 at 3, Ex. 6, Fernandez–Rocha Depo. at 81. The Family Health Center paid the professional association for the services rendered by Dr. Sanchez, Dr. Ramon, and Dr. Fernandez–Rocha; it did not pay the individual physicians directly. *See* United States, Ex. 2 at 3, Ex. 3 at 2. Although the Family Health Center took deductions from the salaries of its employees for Social Security, Medicare, and federal income taxes, it took no such deductions from Dr. Sanchez, Dr. Ramon, or Dr. Fernandez–Rocha during the relevant period. *See* United States, Ex. 2 at 2–3, Ex. 3 at 2–3.

Dr. James Bridges, who was responsible for overseeing the operation of the obstetrical and gynecological department at the Family Health Center, testified that he spent less than fifty percent of his professional time at the Family Health Center during the relevant period. He stated that he rarely saw the members of the Sanchez, Fernandez–Rocha, & Pou, P.A., group at the clinic. His contacts were limited to meetings at the doctors' private offices or restaurants to discuss any problems they were having at the Family Health Center. Dr. Bridges evaluated Dr. Sanchez, Dr. Ramon, and Dr. Fernandez–Rocha only once a year, and these evaluations were based on his relationship with the doctors and patient outcomes. *See* United States, Ex. 5 at 18–20, 30–33, 36–37, 73. Dr. Bridges testified that the only time he ever reviewed a patient's medical chart with a member of the professional association was in this case. *See* United States, Ex. 5 at 31. He never considered himself to be the doctors' supervisor, and he stated that he did not supervise their daily activities. *See* United States, Ex. 5 at 32. Dr. Vincent Jarvis, who was the Medical Director at the Family Health Center, also testified that he did not supervise or evaluate the medical care administered to patients by Dr. Ramon, Dr. Sanchez, and Dr. Fernandez–Rocha. *See* United States, Ex. 4 at 12, 15; Ex. 2 at 4–5.

The doctors also have provided valuable insight into the nature of their relationships with Dr. Bridges and Dr. Jarvis. Dr. Ramon stated that she may have met Dr. Bridges once at her office in Mercy Hospital. She could not recall whether a Medical Director actually supervised her activities at the Family Health Center. *See* United States, Ex. 7, Ramon Depo., at 50. Dr. Sanchez testified that he could not recall Dr. Bridges ever reviewing any of his patients' medical charts. As to the Medical Director, Dr. Sanchez stated that

his contact with Dr. Jarvis was limited to conducting meetings to improve the flow and care of all patients and the Family Health Center. *See* United States, Ex. 8, Sanchez Depo., at 72–73. Dr. Fernandez–Rocha also stated that his contact with Dr. Jarvis was limited to administrative issues and that Dr. Jarvis never discussed medical issues concerning obstetrical or gynecological patients with him. Dr. Bridges would come to the Family Health Center to cover if one of the doctors was on vacation, to supervise the physicians' assistants, or, on a couple of occasions, to discuss problems with patients. *See* United States, Ex. 6, at 73–78.

All of these circumstances indicate that Dr. Sanchez, Dr. Ramon, and Dr. Fernandez–Rocha were not employees of the Family Health Center. Neither Dr. Bridges nor Dr. Jarvis, the individuals who exercised a supervisory capacity at the Family Health Center during the relevant period, supervised the individual doctors on a day-to-day basis. *See Linkous v. United States,* 142 F.3d 271, 276 (5th Cir. 1998) (finding that doctor was not employee where government clinic exercised control over administrative aspects of practice, but no control over daily rendition of medical services). The circumstances of the doctors' employment, wherein they received no benefits from the Family Health Center and were paid by the professional association, also indicate that they were not employed by the Family Health Center.

■ Most importantly, the 1995 agreement specifically states that the parties intended to create an independent contractor relationship, and no other evidence contradicts this. *See Broussard v. United States,* 989 F.2d 171, 176 (5th Cir.1993) (finding that physician was not employee of government where government had con-

tract with association that stated that association was to provide physician's services as an independent contractor and government would retain no control over their services). The plaintiffs attempt to discount this point by asking the court to look beyond the four corners of the contract and look into the parties' intent when drafting the agreement. According to the plaintiffs, the doctors and the Family Health Center intended to create an employer relationship under the FTCA when they executed the 1995 agreement, not a contractor relationship. In support of this argument, the plaintiffs introduce the doctors' testimony and the agreements that were executed in 1996, which were between the individual physicians and the Family Health Center, rather than the professional association and the Family Health Center. This argument is without merit because, where the contractual language is clear, as it is in this case, a court will not look at extraneous testimony to determine the parties' intent. *See In re Yates Devp., Inc.*, 256 F.3d 1285, 1289 (11th Cir.2001). Additionally, a physician's belief or reliance on representations regarding immunity is not a reliable indicator of the parties' intent. *See Lilly v. Fieldstone*, 876 F.2d 857, 859 (10th Cir. 1989) (stating that physician's personal knowledge that military doctors are immune from civil liability is not a clear indicator of parties' intent).

■ In any event, the subsequently-executed 1996 agreements refute, rather than support, the plaintiffs' contention.[15]

Whereas the 1995 agreement did not mention indemnification or the FTCA, the 1996 agreements specifically provide, "Federal Tort Claims Act coverage is extended to [individual doctor].... Health Center warrants that the Federal Tort Claims Act covers PHYSICIAN and hereby indemnifies PHYSICIAN for any claim, loss, suit, damage, or liability...." Pl.Ex. 2 at ¶ 5. If the parties had intended for the 1995 agreement to extend FTCA coverage to the doctors, they could have included the same provision they used in the 1996 agreement. A different meaning cannot be attributed to the 1995 agreement simply because the doctors and/or the Family Health Center realized that, upon the expiration of that agreement, their original contract with the Family Health Center did not sufficiently preserve the doctors' interests.[16]

Other courts have had occasion to apply the principles of *Orleans* to private physicians working under contractual relationships with medical facilities operated by or receiving funds from the United States. All of the circuits consistently have held that physicians in private practice or associated with an organization under contract to provide medical services to facilities operated by the federal government are independent contractors, not employees of the government for FTCA purposes. *See, e.g., Duplan v. Harper*, 188 F.3d 1195, 1200–01 (10th Cir.1999); *Robb v. United States*, 80 F.3d 884, 890 (4th Cir.1996); *Carrillo v. United States*, 5 F.3d 1302, 1304–06 (9th Cir.1993); *Broussard v. United States*, 989

---

**15.** The negligent conduct in question allegedly occurred between January and April of 1996. The parties' relationship in this case is governed by the 1995 agreement because this contract was in effect between December 1995 until December of 1996.

**16.** The plaintiffs also argue that the doctors were apparent agents of the United States.

This argument is without merit because the doctrine of apparent agency is not a proper basis for a waiver of sovereign immunity under the FTCA. *See Spitzer v. United States*, 1988 WL 363944, *6 (S.D.Ga.1988); *Walker v. United States*, 549 F.Supp. 973 (W.D.Okl. 1982).

F.2d 171, 174–76 (5th Cir.1993); *Leone v. United States,* 910 F.2d 46, 48–51 (2d Cir. 1990); *Lilly v. Fieldstone,* 876 F.2d 857, 859–60 (10th Cir.1989); *Lurch v. United States,* 719 F.2d 333, 336–38 (10th Cir. 1983); *Bernie v. United States,* 712 F.2d 1271, 1273 (8th Cir.1983); *see also Cruz v. United States,* 70 F.Supp.2d 1290, 1294–95 (S.D.Fla.1998) (finding that physician associated with organization providing medical services to government-operated facility was not employee of government for FTCA purposes). It is noteworthy that, in the few instances when courts have found the physicians to be employees rather than contractors, the United States was the party arguing that the physician was an employee under the FTCA. *See Ezekiel v. Michel,* 66 F.3d 894, 900 (7th Cir.1995) (finding resident physician was employee when United States advocated that position); *Alexander v. Mount Sinai Hosp. Med. Ctr. of Chicago,* 2001 WL 395167*3, No. 00C2907 (N.D.Ill. Apr. 13, 2001) (finding that physician was employee under FTCA when United States advocated that position); *Brown v. Health Svc., Inc.,* 971 F.Supp. 518 (M.D.Ala.1997) (same); *Costa v. United States Dept. of Vet. Affairs,* 845 F.Supp. 64, 66–69 (D.R.I.1994) (same). In this case, the United States disagrees with the plaintiffs' and physicians' position that the doctors are covered by the FTCA, and it has presented sufficient evidence to establish that the doctors are not employees under the FTCA. Accordingly, the court agrees with the United States and finds that Dr. Sanchez, Dr. Ramon, Dr. Fernandez–Rocha, and Sanchez, Fernandez–Rocha, & Pou, P.A. were not employees of the United States during the relevant period.

## C. Whether the Doctors and Professional Association Are Contractors

 The plaintiffs next contend that the individual doctors qualify as contractors within the scope of the FSHCAA because they contracted with the United States under the 1995 agreement.[17] The FTCA contains a limited waiver of the United States's sovereign immunity, allowing a plaintiff to sue the United States for damages for injuries resulting from certain torts of government employees acting within the scope of their employment. *See Robb v. United States,* 80 F.3d 884, 887 (4th Cir.1996) (citing 28 U.S.C. § 1346(b)); *Tisdale,* 62 F.3d at 1371. An " '[e]mployee of the government' includes officers or employees of any federal agency, members of the military or naval forces of the United States, ... and persons acting on behalf of a federal agency in an official capacity, temporarily or permanently in the service of the United States." *Id.* (quoting 28 U.S.C. § 2671). Because the term "federal agency" explicitly excluded "any contractor with the United States," Congress had not waived the sovereign immunity of the United States for injuries resulting from the actions of independent contractors performing work for the government.[18] *See Orleans,* 425 U.S. at 814, 96 S.Ct. 1971.

---

**17.** Although the 1995 agreement provides that Sanchez, Fernandez–Rocha, & Pou, P.A., has the status of a contractor, the professional association cannot be an independent contractor within the meaning of the FSHCAA because the Eleventh Circuit has limited the scope of the definition to cover only individual physicians who contract with eligible entities, not organizations or foundations that

contract with eligible entities. *See Dedrick v. Youngblood,* 200 F.3d 744, 746 (11th Cir. 2000) (analyzing definition of contractor in 42 U.S.C. § 233(g) and finding that it applies only to individuals).

**18.** The FTCA, as a waiver of sovereign immunity, is strictly construed, and all ambiguities are resolved in favor of the sovereign. *See*

■ In 1993, Congress amended 42 U.S.C. § 233 to extend FTCA protection to qualifying federally supported health centers.[19] *See Wilson v. United States,* 976 F.Supp. 1157, 1159 (N.D.Ill.1997). The FSHCAA sought to eliminate the expense borne by federally funded health centers for medical malpractice insurance, enabling the clinics to funnel more federal dollars into patient care. *See id.* (citing H.R.Rep. No. 104–398, 104th Cong., 1st Sess. (1995), U.S. Code Cong. & Admin. News at 767); *see also* H.R.Rep. No. 102–823(II), 102d Cong., 2d Sess. (1992), U.S. Code Cong. & Admin. News at 2627. The FSHCAA defined a Public Health Service employee to include "an entity described in [§ 233(g)(4) ], and any officer, governing board member, or employee of such an entity, and any contractor of such an entity who is a physician or other licensed or certified health care practitioner (subject to paragraph 5)." § 42 U.S.C. 233(g)(1)(A). Paragraph (5) states:

an individual may be considered a contractor of an entity . . . only if . .

A) the individual normally performs on average of at least 32 ½ hours of service per week for the entity for the period of the contract. § 233(g)(5); or

B) in the case of an individual who normally performs less than 32½ hours of service per week for the entity for the period of the contract, the individual is a licensed or certified provider of services in the fields of family practice, general internal medicine, general pediatrics, or obstetrics and gynecology.

42 U.S.C. § 233(g)(5).

■ Suits brought under the FTCA generally are limited to those claims arising from the negligent conduct of government employees. § 28 U.S.C. 1346(b). The FTCA retains sovereign immunity over claims against contractors. *See Tisdale v. United States,* 62 F.3d 1367, 1371 (11th Cir.1995). However, when a statute like the FSHCAA expands the liability of the government, the court must strictly construe the language used by Congress because the inclusion of contractor liability serves as an expanded waiver of sovereign immunity. *See, e.g., Department of the Army v. Blue Fox, Inc.,* 525 U.S. 255, 119 S.Ct. 687, 691, 142 L.Ed.2d 718 (1999).

■ The expanded definition of a "contract employee" under § 233(g)(1)(A) of the Act to certain contractors of qualified health centers is not an unlimited extension to all contractors. The text of § 233(g) states "or any contractor of such an entity who is a physician or other licensed or certified health care practitioner." 42 U.S.C. § 233. Under this provision, a physician is a contract employee only if he or she has entered into a contract with a qualified entity, which, in this case, is the Family Health Center. Because the 1995 agreement was between Sanchez, Fernandez–Rocha, & Pou, P.A. and the Family Health Center, the United

---

*United States v. Nordic Village, Inc.,* 503 U.S. 30, 33, 112 S.Ct. 1011, 117 L.Ed.2d 181 (1992); *Williams,* 50 F.3d at 305. Accordingly, the independent contractor exception to the waiver of sovereign immunity has been construed broadly. *See Robb,* 80 F.3d 884, 887 (4th Cir.1996); *Lurch v. United States,* 719 F.2d 333, 338 (10th Cir.1983). Although state law governs the substantive duties of the United States under the FTCA, 28 U.S.C. § 1346(b), whether a person is a contractor or an employee is determined by federal law.

*See Robb,* 80 F.3d at 887 (citing *Logue v. United States,* 412 U.S. 521, 528, 93 S.Ct. 2215, 37 L.Ed.2d 121 (1973)).

**19.** Section 233(g) was added to the existing statute and extended FTCA protection of federally supported health centers. 42 U.S.C. § 233(g). This subsection became effective January 1, 1993 and is applicable to this case. *See* 42 U.S.C. § 233(g)(1).

States argues that there was no individual contract between Dr. Sanchez, Dr. Ramon, or Dr. Fernandez–Rocha and the Family Health Center, and, therefore, those doctors cannot claim protection under the FTCA. The plaintiffs urge the court to look beyond the status of the professional association as a separate legal entity and find that the individual doctors were signatories to the contract.

The Eleventh Circuit addressed a similar issue in *Dedrick v. Youngblood*, 200 F.3d 744 (11th Cir.2000), where it held that a doctor who provided services to an eligible entity pursuant to a contract between the entity and the doctor's employer did not qualify as a contractor under the FSHCAA. *Id.* at 746–47. The doctor in *Dedrick*, Dr. Youngblood, was an employee of the Capstone Health Services Foundation. Dr. Youngblood provided medical services to a federally supported health center pursuant to a contract entered into between the health center and Capstone Health Services Foundation. *See id.* at 745. The Eleventh Circuit concluded that Dr. Youngblood was not entitled to coverage under the FSHCAA because "strict interpretation requires that a contractor be an 'individual' who contracts with an eligible entity." *Id.* at 746; *see also Cruz v. United States*, 70 F.Supp.2d 1290, 1296 (S.D.Fla.1998) (finding that doctor did not qualify for FSHCAA coverage because he did not satisfy initial requirement that "individual first must have contracted with covered entity"). The Eleventh Circuit reasoned:

> The statutory language of the [FSHCAA] requires us to distinguish contracts by which an individual physician contracts with the eligible entity and those where the physician uses a separate entity, such as Capstone, to contract with the eligible entity. [The eligible entity] contracted with Capstone, his employer. Although Young-

blood is a licensed physician who provided servants to the patients of [the eligible entity] in the area of obstetrics, he did so pursuant to his contractual relationship with Capstone, not based on any contractual relationship with West Alabama.... Youngblood is an employee of the contractor—Capstone. The statutory expansion of government liability under the FTCA does not apply in this case because there is no direct contractual relationship between the eligible entity and the physician.

*Id.* at 746–47.

In *Dedrick*, the Eleventh Circuit declined to address "whether an individual doctor who contracts with an eligible entity through his professional corporation would be protected." *Id.* at 747 n. 4. However, it did go on to state, "A doctor who wishes to be a covered employee is not precluded simply because he is a member of a group or a professional corporation. He is only precluded if he contracts with an eligible entity through another entity or group." This language indicates that the Eleventh Circuit is likely to reach the same result when a physician contracts through his own professional corporation, as long as he or she is working as an employee of that corporation. As the Eleventh Circuit stated, if Dr. Sanchez, Dr. Ramon, and Dr. Fernandez–Rocha had wanted to be covered by the FTCA when they executed the 1995 agreement, they could have contracted directly with the Family Health Center, as they did in 1996. *Compare* United States, Ex. 1; Plaintiffs, Ex. 2. However, in 1995, the professional association, not the individual doctors, contracted with the Family Health Center.

That two out of the three individual doctors were signatories to the 1995 agreement as representatives of the association does not change this result. Under

Florida law, a professional association "is recognized in law as a legal corporate entity separate and distinct from the persons comprising it." *Gershuny v. Martin McFall Mess. Anesthesia, P.A.*, 539 So.2d 1131, 1133 (Fla.1989); *see also Molenda v. Hoechst Celanese Corp.*, 60 F.Supp.2d 1294, 1300 (S.D.Fla.1999); *111 Prop., Inc. v. Lassiter*, 605 So.2d 123, 126 (Fla. 4th DCA 1992). The plaintiffs have introduced no evidence to rebut the presumption that Sanchez, Fernandez–Rocha, & Pou, P.A. was separate and distinct from Dr. Sanchez, Dr. Ramon, or Dr. Fernandez–Rocha. That a non-named physician, Dr. Ramon, is a party to the action and allegedly as liable as the doctors who signed the contract (Dr. Sanchez and Dr. Fernandez–Rocha) indicates that all three doctors were acting as employees of the professional association during the relevant period. The physicians' decision to enter into new contracts with the Family Health Center in 1996 in their individual capacity, rather than through the professional association, also shows that the physicians were aware of the legal significance of their decisions when executing the agreements, first through the professional association, then in their own names.

In their opposition to the United States' motion, the plaintiffs repeatedly rely on the fact that Dr. Sanchez and Dr. Fernandez–Rocha signed the contract with the Family Health Center on behalf of the professional association. They cite to *Alexander v. Mount Sinai Hospital Medical Center of Chicago*, 2001 WL 395167, No. 00C2907 (N.D. Ill. Apr. 13, 2001), where the court found that the defendant physician, who signed the contract on behalf of his corporation, was a contractor with the United States. *Id.* at *2.[20] The facts in *Alexander* are distinguishable from those of this case. In *Alexander*, the physician was the sole shareholder and employee of the corporation. Here, only two out of the three defending doctors are named members of the professional association, and another member is not a defendant in this case. The agreement in *Alexander* referred to the corporation as the "Physician." In this case, the relevant agreement refers to the professional association as the "Physician Group." It is only the subsequent agreement, which does not purport to be on behalf of the professional association and is not at issue, that uses the term "Physician." The court in *Alexander* found that the corporation essentially acted as the physician's alter ego with respect to his professional relationship with the eligible entity, but the plaintiffs in this case have introduced no evidence to support such a finding. All of these circumstances make *Alexander* inapplicable.

The plaintiffs also contend that "to limit FTCA coverage only to individual doctors as opposed to the individual doctors who contract with the eligible entity through their professional association would be inconsistent with the purpose of § 233(g) which expanded the liability of the government to provide FTCA coverage to ... licensed or certified providers of services in the fields of 'obstetrics and gynecology'." Pl. Resp. ¶ 29. This argument is without merit because physicians who want to make sure they are protected simply need to enter into agreements in their individual capacities, as the doctors did in 1996. Otherwise, if they choose to sign an "intermediate or subcontract", as was done in this case in 1995, they will not be protected. *See Dedrick*, 200 F.3d at 747. Because Dr. Ramon, Dr. Sanchez, and Dr.

---

**20.** *Alexander* is one of those limited instances where a court has found that the physician is an employee under the FTCA. As in all such cases, in *Alexander*, the United States argued for FTCA coverage.

Fernandez–Rocha chose the latter option in 1995, they do not fall under the definition of contractor in the FSHCAA and, accordingly, are not covered by the FTCA.

### D. Estoppel

As an alternative argument, the plaintiffs contend that the United States must be equitably and/or judicially estopped from arguing that the doctors and professional association are not covered by the FTCA because that position is inconsistent with what the United States argued in *Alexander v. Mount Sinai Hospital Medical Center of Chicago,* 2001 WL 395167, No. 00C2907 (N.D.Ill. Apr. 13, 2001). An additional inconsistency is the testimony of Caleb Davis, the Administrator and Chief Executive Officer of the Family Health Center, who stated that, during the negotiation of the 1995 agreement, he had assured the doctors they would be covered by the FTCA.

 The plaintiffs' argument must be rejected because equitable estoppel is rarely valid against the government. *See Linkous v. United States,* 142 F.3d 271, 277 (5th Cir.1998). In order to establish estoppel against the government, a party must prove affirmative misconduct by the government in addition to the four traditional elements of the doctrine.[21] *See id.* (finding that plaintiff failed to demonstrate affirmative misconduct by government so as to equitably estop government from denying physician's status as employee under FTCA); *Carrillo v. United States,* 5 F.3d 1302, 1306 (9th Cir.1993) (same); *Broussard v. United States,* 989 F.2d 171, 177 (5th Cir.1993) (same). Even if the plaintiffs could establish the four elements of estoppel, their argument still would fail

because the record is devoid of any evidence of government misconduct, and the plaintiffs have failed to allege as much. Additionally, the United States has averred that its inconsistent positions have arisen only out of inadvertence and mistake. Under these circumstances, the plaintiffs cannot establish agency by estoppel.

### E. Conclusion

The United States has shown that Dr. Sanchez, Dr. Ramon, Dr. Fernandez–Rocha, and the professional association were neither employees nor covered contractors under the FSHCAA. As a result, these defendants are not covered by the FTCA, and the United States cannot be substituted for them as a defendant. Accordingly, the United States' motion for summary judgment must be granted, and Dr. Sanchez's motion must be denied.

## II. Dr. Portuondo's and ERMA's Motion for Summary Judgment

Count V of the plaintiffs' fourth amended complaint is against Dr. Portuondo for negligence, and count VI is against ERMA, Dr. Portuondo's employer, for vicarious liability. Dr. Portuondo was the treating emergency room physician at Mercy Hospital on April 15, 1996. When Fernandez checked herself into the hospital on that date, Dr. Portuondo ordered an ultrasound examination, was informed of the results, and transferred Fernandez to the labor and delivery department of the hospital. The plaintiffs claim that Dr. Portuondo committed the following acts of negligence when he treated Fernandez: (a) failed to conduct an adequate physical examination and failed to obtain proper

---

**21.** The four traditional elements of estoppel are: (1) that the party to be estopped was aware of the facts, and (2) intended his act or omission to be acted upon; (3) that the party asserting estoppel did not have knowledge of the facts, and (4) reasonably relied on the conduct of the other to his substantial injury. *See Linkous,* 142 F.3d at 278.

medical history; (b) failed to identify and treat an incompetent cervix and/or preterm labor; (c) discharged Fernandez without hospitalization and without adequate medical instruction; (d) failed to conduct a pelvic examination; and (e) failed to act upon the results of Fernandez's ultrasound, which indicated a "prolapse of the amniotic sac through the cervix and an incompetent cervix." 3d Am. Compl. at ¶ 52(a)-(g).

Dr. Portuondo and ERMA argue two points in support of their motion for summary judgment. First, they contend that they are entitled to summary judgment because the plaintiffs did not file the third amended complaint within the applicable limitations period. Second, they argue that the record contains no evidence of negligence by Dr. Portuondo. As explained below, the plaintiffs correctly contend that Dr. Portuondo's and ERMA's motion must be denied because there are genuine issues of material fact as to both issues.

## A. Statute of Limitations

█ Pursuant to section 95.11(4)(b) of the Florida Statutes [22], "An action for medical malpractice shall be commenced within 2 years from the time the incident giving rise to the action occurred or within 2 years from the time the incident is discovered, or should have been discovered with the exercise of due diligence." According

to Dr. Portuondo and ERMA, this statute gave the plaintiffs until October 12, 1998 to file their suit against them.[23] The plaintiffs contend that they filed their claim against these defendants well before the alleged cutoff date because Dr. Portuondo and ERMA were named as defendants when the plaintiffs filed their second amended complaint on September 23, 1998. The defendants respond that the complaint was not validly filed on September 23, 1998, because the record contains no order granting the accompanying motion for leave to amend nor consent by the remaining parties.[24] They contend that the only valid complaint is the third amended complaint, which was filed with leave of court on December 2, 1998, after the statute of limitations allegedly had run.

Notwithstanding this argument, during oral argument on summary judgment, Dr. Portuondo and ERMA conceded that, if the plaintiffs and the already-named defendants had an agreement relating to the filing of a second amended complaint, their argument regarding the statute of limitations would fail. *See Bice v. Metz Constr. Co.*, 699 So.2d 745, 746 (Fla. 4th DCA 1997) (upholding denial of newly-added defendant's motion to dismiss where other adverse parties had consented to filing of amended complaint). The plaintiffs have presented evidence to create a genuine issue of material fact as to whether the

---

**22.** When a federal court exercises supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367, it must apply state substantive law. *See Lundgren v. McDaniel*, 814 F.2d 600, 605 (11th Cir.1987).

**23.** This date takes into account tolling provisions, which need not be discussed for purposes of this motion.

**24.** This issue is governed by Florida law because the second amended complaint was filed in state court, prior to removal by the United States. The applicable Florida rule is

exactly the same as the Federal Rule of Civil Procedure. Florida Rule of Civil Procedure 1.190(a) states that a party may amend a pleading once as a matter of course if it is amended within twenty days after it is served. Otherwise, amendments may only take place by consent or leave of court. Because the pleading at issue is a second amended complaint, the defendants are correct that, in order to be deemed filed on September 23, 1998, the plaintiffs must have obtained leave of court or consent of the parties.

second amended complaint was filed with the consent of the adverse parties. As an exhibit to their response to Dr. Portuondo's and ERMA's supplemental brief, the plaintiffs attached a letter from Joel Wolpe, who represents some of defendants in this matter. That letter states that there was "no objection to the filing of that second amended complaint." Such evidence supports a finding that the second amended complaint was filed in compliance with the Florida Rules of Civil Procedure.

■■■■ Dr. Portuondo's and ERMA's position regarding the statute of limitations must be rejected for another reason. It is not clear from the record that the statute of limitations expired on the date argued by these defendants. According to Dr. Portuondo and ERMA, the statute of limitations in this case began to run on April 27, 1998, and, when the tolling dates are taken into account, it should have expired on October 12, 1998. The defendants' choice of a triggering date is based on the faulty premise that the statute of limitations in a medical malpractice case such as this begins to run on the date of the child's birth. The Florida Supreme Court rejected such an automatic rule in *Tanner v. Hartog*, 618 So.2d 177 (Fla. 1993), a case involving a stillbirth. The court held that the "knowledge of injury" referred to in the statute of limitations, Florida Statutes § 95.11(4)(b), "means not only knowledge of the injury but also knowledge that there is a reasonable possibility that the injury was caused by medical malpractice." *Id.* at 181. According to the court, "Mere knowledge of a stillbirth, without more, would not suggest the possibility of medical negligence." *Id.* at 182.

As in *Tanner*, mere knowledge, on the date of Del Valle's birth, that he was born with certain birth defects does not automatically trigger the running of the statute of limitations. Del Valle's premature birth could have been caused by natural consequences or medical malpractice. Fernandez did not become aware of her diagnosis of an incompetent cervix until sometime after the birth of her son, and, as a result, she could not have known that the doctors failed to treat this condition until the date she discovered its existence. There is nothing in the record to show that, on the date her son was born, Fernandez knew that she had an incompetent cervix or that the doctors had committed malpractice. The Florida Supreme Court recognized that the rule it announced in *Tanner* would "make it harder to decide as a matter of law when the statute begins to run," but it also recognized that, in circumstances such as these, it is the fact-finder who should determine when the "knowledge of injury" occurred. *Id.* at 182.

Even if the plaintiffs became aware, on the day Del Valle was born, that his birth defects were caused by medical malpractice, there is evidence in the record to support a finding that the plaintiffs did not acquire knowledge of Dr. Portuondo's and ERMA's alleged responsibility for their injuries until as late as March 18, 1998. If this is true, the plaintiffs could have had until at least March 18, 2000, to file a complaint against these defendants. The plaintiffs have presented uncontroverted evidence that they did not learn of Dr. Portuondo's involvement in Fernandez's treatment until March 18, 1998. *See* Pl. Resp., 8/13/01, Ex.A. Prior to this date, discovery responses had identified the emergency room physician as Dr. John Marshall. On March 18, 1998, however, Mercy Hospital's counsel informed plaintiffs' counsel that the emergency room physician actually was Dr. Portuondo. The plaintiffs could not have discovered Dr. Portuondo's involvement until that date, as his name was not discernable from medical records and were misinformed as

to his identity. This evidence shows that, not only is there a disputed issue of fact as to the date on which the plaintiffs learned that medical malpractice caused their injuries, but also as to the date on which the plaintiffs learned of Dr. Portuondo's and ERMA's involvement in this case. Accordingly, the defendants' arguments regarding the statute of limitations must be rejected.

### B. Negligence

As an alternative argument, Dr. Portuondo and ERMA contend that the record does not contain evidence to support a finding of negligence by Dr. Portuondo. The record, however, does contain genuine issues of material fact as to whether these defendants committed medical malpractice. Dr. Portuondo was the emergency room physician when Fernandez was admitted to Mercy Hospital on April 15, 1996. Although Dr. Portuondo transferred Fernandez to the labor and delivery department and the care of Dr. Sanchez later that evening, there is evidence that he may have been negligent in his care of Fernandez because of his failure to communicate Fernandez's condition to Dr. Sanchez. *See Munoz v. South Miami Hosp., Inc.,* 764 So.2d 854, 856 (Fla. 3d DCA 2000) (finding that summary judgment was precluded by evidence that hospital doctors failed to inform child's physician of child's kidney failure). Dr. Ramirez, the only physician who diagnosed Fernandez with an incompetent cervix, has testified that he communicated this diagnosis to Dr. Portuondo on April 15, 1996, but Dr. Portuondo never communicated this information to Dr. Sanchez. *See* Ramirez Depo. at 18–19. .

Dr. Portuondo argues that, even if he did fail to inform Dr. Sanchez of Dr. Ramirez's diagnosis, he cannot be held liable for negligence because Dr. Sanchez has testified that he would not have done any-thing differently if Dr. Portuondo had told him that Fernandez had an incompetent cervix. *See* Sanchez Depo. at 40. According to Dr. Portuondo and ERMA, Dr. Sanchez's testimony destroys the causation prong of the plaintiffs' case. *See Gooding v. University Hosp. Bldg., Inc.,* 445 So.2d 1015, 1018 (Fla.1984) (listing elements of medical malpractice as standard of care owed by defendant, defendant's breach of standard of care, and that said breach proximately caused the damages claimed). That is, the plaintiffs cannot prove how Dr. Portuondo's failure to transmit information to Dr. Sanchez caused the injuries of which the plaintiffs complain because Dr. Sanchez would have administered the same treatment with or without the information.

The problem with Dr. Portuondo's argument is that physicians other than Dr. Sanchez treated Fernandez. It may be true that Dr. Sanchez may not have done anything differently, but this does not mean that other physicians in the Family Health Center would not have rendered another form of treatment. For example, if Dr. Portuondo had informed Dr. Sanchez that Fernandez had been diagnosed with an incompetent cervix, Dr. Sanchez may have made a note of this in Fernandez's medical record. Dr. Ramon and other physicians may have learned of this diagnosis from Fernandez's records, and Fernandez also may have learned this information. Dr. Ramon then may have acted differently when Fernandez appeared at the Family Health Center to fill her prescription.

Moreover, under Florida law, Dr. Portuondo's alleged negligence is not excused by what Dr. Sanchez may or many not have done differently. As a Florida court has stated:

> [I]t is not for the [defendant physicians], who putatively violated their standard of care by failing to warn, to argue that

their not doing so had no effect on the situation. . . .

[O]nly speculation can support the assumption that an adequate warning, properly communicated, would not have influenced the course of conduct adopted by a physician, even where the physician had previously received the information contained therein. "What the doctor might or might not have done had he been adequately warned is not an element plaintiff must prove as a part of her case."

*Munoz,* 764 So.2d at 856 (citations omitted).

In addition to Dr. Portuondo's failure to communicate Dr. Ramirez's diagnosis to Dr. Sanchez, the record contains other evidence from which a fact finder can conclude that Dr. Portuondo was negligent in his care of Fernandez. For example, Dr. Alan Panacek, the plaintiff's expert on critical care and emergency medicine, has testified that Dr. Portuondo deviated from the prevailing standard of care by failing to take an adequate history from Fernandez on April 15, 1996 and not clarifying what happened during her prior pregnancies, failing to clarify the meaning of "prolapse of sac into endocervical canal", failing to include polyhydraminous and prolapse sac into endocervical canal in the final diagnosis, failing to risk stratify Fernandez, and failing to make the proper diagnosis. Panacek Depo. at 78, 79, 83, 89–91, 97. Whether Dr. Sanchez would not have done anything differently does not exonerate Dr. Portuondo from adhering to the proper standard of care, as described by Dr. Panacek. *See Daniels v. Weiss,* 385 So.2d 661, 664 (Fla. 3d DCA 1980) (stating that defendant doctor "cannot escape liability simply because a second physician had the opportunity to correct the initial negligent acts but failed to do so") (citations omitted). Accordingly,

Dr. Portuondo's and ERMA's motion for summary judgment is denied.

## III. Dr. Ramon's Motion for Summary Judgment

According to Dr. Ramon, the record contains no evidence to support a finding of negligence on her part. Dr. Ramon's only involvement in the care of Fernandez during her pregnancy involved two visits by Fernandez to the Family Health Center. The first occurred on February 25, 1996, when she was examined by Dr. Ramon, and there is no allegation of negligence regarding this visit. The second occurred on April 17, 1996, when Dr. Ramon wrote Fernandez a prescription for ampicillin. Fernandez claims that Dr. Ramon's failure to examine her prior to writing this prescription constitutes negligence.

In support of her argument that she did not engage in any actions that constitute medical malpractice, Dr. Ramon relies on the testimony of Dr. Donald Charles Creevy, the plaintiff's expert. Dr. Creevy's sole criticism of Dr. Ramon is as follows:

Dr. Ramon should have had information about the hospital visit of April 15th, April 16th, with the ultrasound, with the complaint of leakage of amniotic fluid. And if, in fact, she had that information available to her, she should have done an actual visit and examine that patient, not just handing the nurse a prescription.

Creevy Depo. at 156. Dr. Creevy also stated:

Q. [by Dr. Ramon's counsel] It's fair to say that Dr. Ramon did not have that information from the hospital, did she?

A. [by Dr. Creevy] It's my understanding that that information was not transmitted from the hospital to the clinic, in any way, including by Dr. Sanchez.

Q. That's not Dr. Ramon's failing, it is?

A. It's not her failing specifically. It's a failing of the clinic and the staff doctors there as a group....

Q. And had Dr. Ramon prescribed a presription without an examination based on the nurse having done an examination, would that be appropriate?

A. Yes.

Creevy Depo. at 156–62. At first glance, this case appears to be similar to the situation in *Munoz v. South Miami Hosp.*, 764 So.2d 854 (Fla. 3d DCA 2000), where the court affirmed summary judgment in favor of an on-call physician who telephonically prescribed treatment based upon the representations of a hospital. *Id.* at 856. The hospital failed to inform the physician that the plaintiff's son had a dangerous kidney condition, and the plaintiff filed a claim against the on-call physician for medical negligence. *See id.* The court found that the physician had "acted entirely correctly on the basis of the limited information conveyed by the hospital personnel." *Id.*

Like the physician in *Munoz*, Dr. Ramon argues that her duty was limited to writing a prescription for Fernandez, not conducting a physical examination, because no one informed her of Fernandez's condition or the test results. Dr. Ramon is correct that she cannot be held legally responsible for another doctor's failure to convey information to her. *See Munoz* at 856.

■■■ Nevertheless, the plaintiffs argue that there is another basis to support their claim that Dr. Ramon had a duty to examine Fernandez prior to writing a prescription. The plaintiffs have introduced the testimony of Daisy Edwards, a nurse, who stated that Fernandez's written instruc-

tions upon leaving the hospital were "*to be seen* and for ampicillin." Edwards Depo. at 103–106 (emphasis added).[25] The plaintiffs' case against Dr. Ramon revolves around Edwards' testimony regarding the discharge orders. This evidence shows that Fernandez arrived at the Family Health Center on April 17, 1996 with the hospital's instructions. Dr. Ramon issued a prescription for ampicillin, but she did not "see" Fernandez, as the hospital had instructed. Viewing this evidence in the light most favorable to the plaintiffs as the non-moving parties, it appears that Dr. Ramon failed to follow the hospital's orders. This creates a genuine issue of material fact as to whether Dr. Ramon was negligent in her care of Fernandez. Accordingly, her motion for summary judgment must be denied.

## IV. Mercy Hospital's Motion for Summary Judgment

In count VIII of the fourth amended complaint, the plaintiffs seek to hold Mercy Hospital directly liable for negligence, and, in count IX, they seek to impose vicarious liability for the alleged negligence of Dr. Sanchez, Dr. Ramon, Dr. Ramirez, Dr. Fernandez–Rocha, and Dr. Portuondo under a theory of agency or apparent agency. According to Mercy Hospital, it cannot be held directly liable for the physician's acts because those defendants were not hospital employees. Mercy Hospital also argues that there is no evidence to support the plaintiffs' theory of apparent agency. Mercy Hospital is correct that, because the physicians were not its employees, it is not directly liable for their acts. The plaintiffs do not attempt to argue that the individual physi-

---

**25.** The absence of expert testimony on this point does not preclude the introduction of other evidence. *See Moyer v. Reynolds*, 780 So.2d 205, 208 (Fla. 5th DCA 2001) (stating that claimant in medical malpractice action may introduce evidence aside from expert testimony to establish standard of care).

cians actually were Mercy Hospital employees, nor do they name any employees as being negligent. As a result, Mercy Hospital's motion is granted as to count VIII, and that count is stricken from the complaint.

■ In contrast, Mercy Hospital's argument under count XI for apparent agency must fail. The general rule is that a hospital is not vicariously liable for the acts of a physician who is an independent contractor, *see Cedars Med. Ctr., Inc. v. Ravelo,* 738 So.2d 362, 366 (Fla. 3d DCA 1999) (citing *Public Health Trust of Dade Cty. v. Valcin,* 507 So.2d 596, 601 (Fla. 1987)), but some exceptions to this principle exist. One of these is negligence by emergency room physicians. *See Cedars Med. Ctr., Inc.,* 738 So.2d 362 at n. 1 (listing exceptions) (citation omitted). This exception is based on apparent agency theory. When a plaintiff brings a medical malpractice action against an emergency room doctor and a hospital, Florida courts have held that such a case "should go to the jury for a determination of vicarious liability on the part of the hospital for the malpractice of emergency room physicians on the theory of apparent agency." *Orlando Regional Med. Ctr., Inc. v. Chmielewski,* 573 So.2d 876, 879 (Fla. 5th DCA 1990) (finding that issue of hospital's vicarious liability on apparent agency theory for malpractice of emergency room physician was jury question); *see also Irving v. Doctors Hosp. of Lake Worth, Inc.,* 415 So.2d 55 (Fla. 4th DCA 1982); *Webb v. Priest,* 413 So.2d 43 (Fla. 3d DCA 1982). In light of the emergency room physician exception, Mercy Hospital cannot successfully argue that, as a matter of law, it cannot be held vicariously liable for Dr. Portuondo's alleged negligence. This is an issue that must be determined by the jury.

■ A more difficult question is whether Mercy Hospital is entitled to summary judgment on its liability for the acts of the remaining physicians, who were not emergency room doctors. As in cases involving emergency room physicians, Mercy Hospital's potential liability is governed by apparent agency theory. This doctrine affords a plaintiff recovery where "a hospital holds out a physician as its agent and/or employee, and a patient accepts treatment from that physician in the reasonable belief that it is being rendered on behalf of the hospital." *Cuker v. Hillsborough Cty. Hosp. Auth.,* 605 So.2d 998, 999 (Fla. 2d DCA 1992) (finding that jury question existed as to whether hospital created appearance of apparent authority for doctors working in hospital's labor and delivery department) (citations omitted).

■ " 'Apparent authority' does not arise from the subjective understanding of the person dealing with the purported agent, nor from appearances created by the purported agent himself; instead, 'apparent authority' exists only where the *principal* creates the appearance of an agency relationship." *Izquierdo v. Hialeah Hosp., Inc.,* 709 So.2d 187, 188 (Fla. 3d DCA 1998) (finding that neither doctor's actions nor plaintiff's understandings could have created requisite apparent authority) (emphasis in original) (citations omitted). This means that it is irrelevant that Fernandez believed that Dr. Sanchez, Dr. Ramon, and Dr. Fernandez–Rocha were Mercy Hospital employees and that the nature of the physicians' practice created the appearance of an agency relationship. What matters is whether the record contains any evidence of actions by Mercy Hospital that could have created the apparent agency. According to Mercy Hospital, the record is devoid of such evidence because no one at the hospital ever told Fernandez, or led her to believe, that the physicians were hospital employees. The plaintiffs, on the other hand, argue that there are genuine

issues of material fact as to whether Mercy Hospital created the appearance of an agency relationship.[26] The plaintiffs rely on a statement by Fernandez, who claims that there was a transparent plaque on the wall at Mercy Hospital that listed the gynecologists who worked at Mercy Hospital, including Dr. Sanchez, Dr. Ramon, and Dr. Fernandez–Rocha. *See* Fernandez Depo. at 83–86.[27] Additionally, during the relevant time period, a program was in effect whereby the Family Health Center was to perform deliveries at Mercy Hospital. Dr. Bridges testified that part of the program was designed so that patients who were treated by Fernandez–Rocha, Sanchez, & Pou, P.A. would tour Mercy Hospital facilities and go to that hospital to deliver their babies. *See* Bridges Depo. at 67–69. Although Mercy Hospital did not execute a contract regarding this program, there is evidence that it actively cooperated with the physicians by sending its CEO, Ed Rosaco to meetings about the program. *See* Fernandez–Rocha Depo. at 64. Although this evidence does not compel a finding, as a matter of law, that Mercy Hospital created the appearance of an agency relationship, it does establish a genuine issue of material fact for the jury to resolve. As such, Mercy Hospital's motion for summary judgment is denied.

It is therefore:

ORDERED AND ADJUDGED THAT:

1) The United States's motion for summary judgment (DE # 218) is GRANTED, and Dr. Sanchez's motion for summary judgment (DE # 364) is DENIED.

Count I of the cross-claim is DISMISSED.

2) Dr. Portuondo's and ERMA's motion for summary judgment (DE # 269) is DENIED.

3) Dr. Ramon's motion for summary judgment (DE # 193) is DENIED.

4) Mercy Hospital's motion for summary judgment (DE # 200) is DENIED AS MOOT due to the filing of the renewed motion for summary judgment (DE # 237). Mercy Hospital's motion for summary judgment (DE # 237) is GRANTED IN PART and DENIED IN PART. Count VIII of the fourth amended complaint is DISMISSED.

5) The following motions are DENIED AS MOOT:

 a) Sanchez's motion to extend time (DE# 232);

 b) United States's motion to extend time (DE # 256); and

 c) the plaintiffs' motion to extend time (DE # 258).

**26.** The plaintiffs also attempt to impose vicarious liability on Mercy Hospital on the basis of an exception for nondelegable duties. This argument must be rejected because, to date, no Florida court has adopted the position urged by the plaintiffs.

**27.** The defendants attempt to discredit Fernandez's testimony by arguing that her statements regarding the sign are not credible, but such determinations are not proper for a judge to make when considering evidence on summary judgment. *See Johnston v. Henderson*, 144 F.Supp.2d 1341, 1347 (S.D.Fla.2001) (citations omitted).